STATE OF WISCONSIN          FAMILY          OUTAGAMIE COUNTY
COURT COMMISSIONER

--------------------------------------------------------------------

RACHAEL R. VANDOMELEN,

        Petitioner,

v                                   Case No. 20-CV-606

MASON O. BEAUDRY,

        Respondent.

--------------------------------------------------------------------

INJUNCTION HEARING FOR DOMESTIC ABUSE

TRANSCRIPT OF PROCEEDINGS

--------------------------------------------------------------------

DATE:     AUGUST 12, 2020

TIME:     9:45 a.m.

BEFORE:   MAUREEN ROBERTS BUDIAC
          Family Court Commissioner
          Outagamie County, Wisconsin

<u>APPEARANCES</u>


RACHAEL R. VANDOMELEN, PETITIONER
Appeared by Speakerphone



MASON O. BEAUDRY, RESPONDENT
Appeared by Speakerphone



# I N D E X

WITNESSES                                                          PAGE


RACHAEL R. VANDOMELEN

    Examination by the Court...........................................4


MASON O. BEAUDRY

    Examination by the Court..........................................10

```
 1                          PROCEEDINGS

 2              THE COURT:  This is Rachael Vandomelen vs. Mason

 3    Beaudry, 20-CV-606.  Both the petitioner and the respondent

 4    appear by Pexip telephone.  The court reporter is also on.

 5              Mr. Beaudry, could you state your address for me,

 6    please?

 7              MR. BEAUDRY:  ████████████████████████████████

 8    ██████████

 9              THE COURT:  ██████████████████████████

10              MR. BEAUDRY:  ████████████████████████

11              THE COURT:  Thanks.  We just had the first part,

12    we didn't know what city.

13              You have been properly served with the request

14    for a domestic abuse injunction.  Do you agree she is

15    entitled to the injunction, or do you disagree?

16              MR. BEAUDRY:  Do I agree with the paperwork here?

17              THE COURT:  Yeah.

18              MR. BEAUDRY:  No, I disagree with it.

19              THE COURT:  All right, then we're going to take

20    some testimony.

21              Ms. Vandomelen, I'm going to have you raise your

22    right hand while the clerk swears you in.

23                    RACHAEL R. VANDOMELEN,

24    called as a witness, after being first duly sworn, was

25    examined and testified as follows:
```

3

```
1              THE COURT:  State and spell your name for the
2      record, please.
3              THE WITNESS:  Rachael Vandomelen, R-A-C-H-A-E-L
4      V-A-N-D-O-M-E-L-E-N.
5              THE COURT:  Okay, you must have moved your mouth
6      away from the phone a little bit, so make sure you're
7      speaking clearly and slowly into the phone.
8                           EXAMINATION
9  BY THE COURT:
10 Q     All right, so you filed this.  Why don't you explain to me
11       why you feel you need the injunction.  Specific
12       circumstances, please.
13 A     Well, at this point, I mean, Mason continues to show up,
14       whether it's -- I currently live with my parents, which
15       is -- I move out at the end of the week, but he like
16       continues to show up when he's not invited, after the fact,
17       when I've asked him not to come, or asked him not to -- not
18       to come into the house, and he just has no respect for me.
19       At this point, I guess I'm just not sure what else I'm
20       supposed to do.  I don't want him showing up at my new
21       residence.  It's going to be really difficult to --
22 Q     You need to --
23 A     Sorry?
24 Q     You need to go over what you're saying is the domestic abuse
25       portion of the injunction.
```

4

```
 1    A    Okay, well, I guess what I'm saying is, at this point, I
 2         don't know what my options are.  That's what I'm telling
 3         you.  I'm saying, I don't know what else to do with the
 4         situation because he doesn't listen to me.  I'm not sure --
 5    Q    That's why we're here.  You filed the request for a domestic
 6         abuse injunction.  So this is your chance to testify to the
 7         Court and explain why you want the domestic abuse
 8         injunction.  Like I said, it's got to meet the definition of
 9         domestic abuse, intentional infliction or threat to inflict
10         physical pain, physical --
11    A    I was told to file.  I was told to file the domestic because
12         we had already had a domestic together.  I was --
13    Q    Tell me about that.  I don't know anything about that.  I
14         don't know anything about that.
15    A    Well, I don't really think that that situation necessarily
16         applies to this one.  I was just referred to file a domestic
17         because of our previous domestic together; however, that was
18         like some time ago and Mason and I haven't had physical
19         contact like that since.
20              MR. BEAUDRY:  Am I allowed to speak?
21              THE COURT:  Not until she's done and you're sworn
22         in.
23    BY THE COURT:
24    Q    I'm a little confused, Ms. Vandomelen.  I mean, I know this
25         is difficult because everyone is on the phone and you're not
```

5

```
1        in a courtroom.  I mean, you have to picture that you're
2        sitting on a witness stand in the courtroom and you're
3        trying to explain to me why you want the no-contact order
4        put in place, and just telling me he shows up uninvited
5        isn't a form of domestic abuse, but it's got to be --
6    A   Okay, I -- I understand.
7    Q   You can use that incident.  Okay, you can use that incident
8        but you can't use him threatening other people, you know.
9        But what specific things have been said towards you or what
10       incidents towards you that you filed this?
11   A   Mason, okay, like I said, Mason has not threatened me
12       physically in that incident.  I was told to file a domestic
13       restraining order because of our domestic that we had had
14       months ago.
15   Q   Yes.
16   A   And that's the only reason I filed this as a domestic.  At
17       this point, I just -- what I'm speaking for is him to
18       respect boundaries in the sense that he can't show up to my
19       work, he can't show up at my residence without an
20       invitation, and it's not acceptable.  I mean, tell me what
21       you think would be the best route to take.  But that is why
22       I filed the domestic restraining order instead of a
23       harassment because that's what my lawyer had instructed me
24       to do.
25   Q   Okay, now that we're here -- but then --
```

6

```
 1    A    I guess what I'm saying is that Mason hasn't threatened to
 2         physically harm me.  He hasn't threatened to physically harm
 3         me and we haven't had a physical altercation at all.
 4                   MR. BEAUDRY:  I'm looking at the paperwork right
 5         now.
 6                   THE COURT:  Sir, it's not your turn.  I'll get to
 7         you.  Don't interrupt.
 8    BY THE COURT:
 9    Q    So Ms. Vandomelen, it sounds to me like you want this
10         dismissed.
11    A    No, what I'm saying is -- okay, what I'm saying is, what do
12         you think I should do?  If it's not a domestic, do I need to
13         file as a harassment, like putting -- I can't -- I can't --
14    Q    I want you to explain to me --
15    A    (Undecipherable) -- my job.
16    Q    Okay first of all, you're --
17    A    (Undecipherable)
18                   COURT REPORTER:  I'm having trouble
19         understanding.  Please speak clearly and slowly.
20                   THE WITNESS:  Sure.
21    BY THE COURT:
22    Q    I think, Ms. Vandomelen, I'm not making myself understood.
23         I'm looking at what you filed.  You said on multiple
24         occasions he's shown up uninvited, clearly angry and upset,
25         cursing and saying degrading remarks.  Can you be more
```

7

```
 1          specific about those incidents?

 2    A     Well, I mean, when he shows up to where I'm staying and

 3          wants to argue with me, be aggressive, and curse in front of

 4          our small child.  I don't think that's acceptable.  I can't

 5          really think of anything off the top of my head.

 6    Q     Slow down, slow down.  What do you mean by degrading

 7          remarks?  Can you be specific?

 8    A     I don't know, calling me a bitch, calling me names.

 9    Q     What type of names?

10    A     Telling me I suck, or whatever he feels like saying.

11    Q     You said in February he showed up and there was a physical

12          altercation.  Can you explain that to me?

13    A     Back in February I was living at my apartment.  I think it

14          was relatively soon after we had broken up, maybe.  He was

15          upset and I thought he was under the influence.  Obviously,

16          that was neither --

17    Q     I didn't hear that.  I didn't hear that.  Hold on.  Your

18          phone went out a little bit.  You thought he was impaired,

19          and then what did you say?

20    A     We had been arguing.  Our son was sleeping upstairs.  I had

21          put his paperwork -- I had thrown his paperwork out onto the

22          curb because I wanted him to leave, and I was hoping that if

23          I put his paperwork outside, he would go get it and I could

24          shut the door.  At that point, he grabbed me by the arm and

25          we both went outside and he was shoving.  And it's just like
```

8

```
 1          not okay, it's not acceptable behavior.  And like I said,
 2          that was a long time ago, so I don't know if it's fair to
 3          base that off of this.  Like I said, we have not had an
 4          incident like that since February.  There's been nothing
 5          regarding that, but I guess I'm just not sure what to do
 6          when I can't have -- you know, I can't go to work and have
 7          conversations with my boss regularly about him calling or
 8          showing up at my establishment, or I'm moving and I'm not
 9          going to have the police at my new residence every other
10          week because we can't have a functioning co-parenting
11          relationship.  It's like time to grow up.  I don't want to
12          do this anymore.
13     Q    Anything else at this point you want me to know?  I can ask
14          you again at the end if you thought of something else.
15     A    I don't think so.  I don't know.
16                    THE COURT:  All right, then I'll ask Mr. Beaudry,
17          did you want to testify, sir?
18                    MR. BEAUDRY:  Yup.
19                    THE COURT:  Raise your right hand and we'll have
20          the clerk swear you in.
21                         MASON O. BEAUDRY,
22          called as a witness, after being first duly sworn, was
23          examined and testified as follows:
24                    THE COURT:  Will you state and spell your name
25          for me, please.
```

9

```
 1                    THE WITNESS:  My name is Mason Orion Beaudry,

 2         M-A-S-O-N O-R-I-O-N B-E-A-U-D-R-Y.

 3                              EXAMINATION

 4    BY THE COURT:

 5    Q    All right, Mr. Beaudry, she is indicating, at least back in

 6         February, there was a sole physical altercation.  What do

 7         you want to say about that?

 8    A    Yup, well, we can address that first since I guess that's

 9         the first point of interest, which there was police contact,

10         and I did tell them exactly what happened, and what she said

11         is pretty much about right.  I actually dropped my son off

12         to the residence because I had him, and I put him upstairs

13         to sleep, and then I went to go drop off her rent check and

14         then came back, or no, actually, no, no, no, no, no, no, no,

15         that's something entirely different.  So that -- she did

16         throw the child support paperwork out the door because I had

17         realized that she had 100 percent custody of our kid, but

18         that was just a default judgment because neither one of us

19         showed up to the child support hearing, or the child support

20         court hearing.  So I guess automatically -- I guess it was

21         an automatic judgment of giving her 100 percent.  And I was

22         pretty upset, showed up there, told her that I would like

23         this changed, and it pretty much started with the argument

24         there.  And then like she said, she threw my paperwork out

25         the front door, at which point, I knew she was going to try
```

1    locking me out when I went to go grab the paperwork, like

2    she said.  So I grabbed her by the arm, which I told the

3    police all of this.  I grabbed her by the arm.  I didn't

4    shove her, I didn't push her.  She told the cops that I

5    shoved her to the ground on the concrete.  No, that's not

6    what happened.  I did grab her by the arm and I did walk

7    outside with her.  I grabbed my paperwork.  The second I

8    grabbed my paperwork, I let her go.  I walked right back

9    inside, I grabbed my work clothes, and I left, at which

10   point she called the police.  The police called me.  I came

11   right back and talked to them and told them my side of the

12   story.  They said, oh, well, you know, this classifies as a

13   disorderly domestic, you know.  So then they had to arrest

14   me and I bonded myself out of jail for that particular

15   situation.

16        I'm looking at this current paperwork here.  I've looked

17   it over several times, and she says I show up to her

18   residence uninvited.  That's not true, because most of the

19   time I show up to where she's currently living, which is her

20   parent's house, nine times out of ten, she's not there,

21   she's at work, and I show up there with permission from her

22   parents to come see my son.  So I do have permission to be

23   there by the owner of the house.  So they're allowing me to

24   come see my son.  So that's pretty much the only time I ever

25   show up there is when I have permission.  I don't think

```
 1              there's been one occasion where I ever showed up uninvited.

 2                   She says I still currently, continuously show up to her

 3              boyfriend's house, which I haven't done since -- I can

 4              probably look in my text messages -- it was July of 2019,

 5              yeah, 2019, July of 2019.  Or we could go even back to

 6              February of this year, maybe, which I showed up there.  She

 7              said they were going to call the cops, which I left, no cops

 8              were called, but it also says the cops were called six times

 9              in the last eight months.  I can agree to two of the six

10              times.  Yes, I can agree to that.

11    Q    What happened on July 20?

12    A    July 20, which was what, three or four Mondays ago, three

13         Mondays ago?  I showed up there, or well, I had asked, or

14         she had asked me if I wanted to see my son.

15    Q    When you --

16    A    What's that?

17    Q    When you say there, where is there, sir?

18    A    Oh, her parent's house, where she stays.

19    Q    Okay, thank you.  So you showed up at her parent's house.

20         Go ahead.

21    A    Yup, yup, she asked if I wanted to come see my son, which I

22         said, yes, I'll be there at 5:00.  Then she said okay.

23         Well, I told her I was going to lay down and take a nap, and

24         then she was like, well, I want to get the boat running, or

25         this, that, and the third.  So I said, get the boat running.
```

12

```
 1          You know, I said, I'm going to take a nap.  She goes, well,
 2          then I'm going to assume that you're not coming to see your
 3          son.  But during this conversation that her and I were
 4          having, her mom had called me and said, did you know your
 5          dresser is on the curb, because I don't know if you wanted
 6          to keep that or if you didn't want to keep that?  I was
 7          like, well, yeah, I do want to keep that, but I guess it was
 8          in her way because she is moving out.  So then I had texted
 9          her and asked her if she would remove it from the curb,
10          which she said no.  So at this point, it was probably about
11          4:30, 4:45.  So then I went to go there -- which I was going
12          to hang out with my son regardless that day at 5:00.  So I
13          went there, removed the dresser from the curb, got the
14          drawers in my car and got the body of the dresser off the
15          curb and put it by the Blazer.  Her mom said that she was
16          going to help me bring it to my brother's house where I
17          store some of my things.  Well, he's not actually my
18          brother, but I store some things over there at his
19          residence.
20     Q    Sir, why did the police get called?
21     A    The police got called because I had went inside.  I had got
22          my son.  At this time, like I said, it was probably about
23          4:45, 4:50.  I had grabbed him, walked in --
24               MS. VANDOMELEN:  From where, from my arms?
25               THE WITNESS:  No.
```

```
 1                    MS. VANDOMELEN:  You got --

 2                    THE COURT:  You do not get to speak, ma'am.

 3                    THE WITNESS:  So --

 4                    THE COURT:  Stop, stop.  Both of you stop, both

 5          of you stop.  The court reporter can only take down one

 6          person at a time.  Ms. Vandomelen, I did not let him

 7          interrupt you and you cannot interrupt him.  You can make

 8          statements at the end but there's a court reporter.  You

 9          have to remember you are in court right now.  So we can't

10          have you talking back and forth.  You certainly don't get to

11          address each other.

12    BY THE COURT:

13    Q    All right, so you went in to get your son?

14    A    I walked inside, and which he was crying in the back bedroom

15          because he was getting into something that he wasn't

16          supposed to be.  He was laying on his -- actually, I didn't

17          grab him from her arms, but he was laying on her parent's

18          bed because he was eating something that he wasn't supposed

19          to be eating, and she's like, no, you can't eat that.  So,

20          you know, he was doing something he shouldn't have been

21          doing and he must have been mad about it.  Then he seen me,

22          and so he got off the bed and then he was kind of calm,

23          cool, and collected.  I picked him up from the bed.  I

24          walked out of her parent's room.  I walked through their

25          house, and then I walked towards the basement.  She lives in
```

the basement, but there's this little wicker basket of
shoes, of our son's shoes, about three stairs down from the
top of the basement, and you know, I started walking down
the stairs to get to that basket to get some shoes on him
and she said -- she said, what are you going in the basement
for? I said, I'm not going in the basement, I'm grabbing
some shoes, why don't you shut the fuck up. And I told the
cops all of this. I'm going to use the exact words that I
used. And then she's like, well, you're not going to go
anywhere with River now. I was like, okay, I am, because
you already said that I could go to the park with him or go
hang out with him at 5:00. At this point, it's probably
5:00, maybe, roughly. Actually this all maybe happened in a
time span of five minutes. I walked outside with him. She
said, okay, well, I'm calling the cops because you're
leaving. I was like, okay, so call the cops. So she called
the cops. When they showed up I was still outside of her
house. I didn't even leave. I never left. I waited for
them to show up yet again. I talked to them. They asked me
some questions. I showed them some text messages indicating
that it was okay for me to see my son at 5:00. Sharon had
gave me permission to go there and get my dresser off of the
curb. And then they went back and talked to her, got some
information from her. They came back and they are like, all
right, Mr. Beaudry, you can leave, you know, since you guys

| | | |
|---|---|---|
| 1 | | are arguing, or whatever.  It's just in your best interest |
| 2 | | to leave.  Nobody's in trouble here so you can go. |
| 3 | Q | Okay, all right, so your position is there's not been recent |
| 4 | | domestic abuse? |
| 5 | A | Oh, no, not at all. |
| 6 | Q | Have you been charged with any forms of domestic abuse with |
| 7 | | her as the victim? |
| 8 | A | No, just the one from February -- or wait, wait.  When was |
| 9 | | that?  I don't know, it's on my record, though, disorderly |
| 10 | | conduct, domestic abuse/repeater because I was convicted of |
| 11 | | a felony in the last four years so they give you a repeater. |
| 12 | | So I'm not exactly sure when that -- actually, that was in |
| 13 | | August, I believe, early August, maybe, of last year. |
| 14 | Q | I do see that on CCap now that you said that.  That's the |
| 15 | | only one with her? |
| 16 | A | Yup, that's the only one, and you know, the cops called me. |
| 17 | | I went right back to her residence where they were. |
| 18 | Q | Let me ask you this, Mr. -- |
| 19 | A | Yeah. |
| 20 | Q | Is there -- then showing up at her residence ever -- like if |
| 21 | | she's moving into this new residence and doesn't want you |
| 22 | | there, are you going to be -- |
| 23 | A | I don't even know where this new residence is.  So I don't |
| 24 | | know how I can show up at a location that I don't know where |
| 25 | | she's moving to. |

16

```
 1   Q    Do you guys have a schedule?  Do you have a schedule for
 2        placement of the child?
 3   A    Kind of.  Not really.  She still has 100 percent placement
 4        and 100 percent custody, but she made a little schedule that
 5        she wrote up herself but it never gets followed, never gets
 6        followed really because I just pretty much --
 7   Q    I'm saying, is there an order?
 8   A    Oh, if there's like a court order?  No, no, there's nothing
 9        of that nature.  No, not at all.  It's just basically verbal
10        messages back and forth, or you know, calls on the phone
11        indicating, oh, yeah, it's okay to have him or don't have
12        him.  So on and so forth.
13   Q    Okay, so --
14   A    Yeah.
15             THE COURT:  All right, now, Ms. Vandomelen, is
16        there any questions you want me to ask him, or do you just
17        want to make statements in response?
18             MS. VANDOMELEN:  I would like to make a
19        statement, if I may?
20             THE COURT:  Go ahead.
21             MS. VANDOMELEN:  So Mason and I do not have a
22        court ordered schedule.  I was granted full custody, like he
23        said, because, unfortunately, both of us missed the court
24        date, which was unintentional on my behalf.  I just --
25        whatever.  We have had numerous schedules since then.  You
```

17

```
 1    know, there's been a substantial amount of time since then,

 2    but the reason why we have not gone for -- at least on my

 3    behalf, the reason I have not looked into sharing custody

 4    with him is because I don't feel he is in a position where

 5    he can maintain --

 6              THE COURT:  That's not what this is about.

 7    That's not what this is about, okay?

 8              MS. VANDOMELEN:  No, I know, I know.

 9              THE COURT:  Custody and placement aren't --

10              MS. VANDOMELEN:  I'm getting there, I promise.

11    I'm going to make it quick.  There have been numerous issues

12    where I have felt he has been under the influence.  I have

13    told him, you know, whenever he can prove to me that he's

14    not using, then we can look into that.  There has been a

15    schedule made.  Obviously, it's been ten days, or whatever,

16    since I filed this restraining order, that it has been

17    harder to follow because, you know, he isn't allowed at the

18    residence because that's the address that's listed on it.

19              The incident when he had showed up on July 20, I

20    did offer -- it was one of my days, my placement, and I had

21    offered for him to come see our child and we had agreed upon

22    a time.  Then the time was changing and I said, that's not

23    really how it works, you know, you can't just come and go as

24    you want.

25              THE COURT:  Okay.
```

18

```
 1              MS. VANDOMELEN:  I told him if he couldn't agree
 2       to the time we originally agreed to, then it wasn't going to
 3       happen.  When that occurred, when he came to the house, my
 4       mom had not texted me and indicated she had given him
 5       permission because we do not have the best relationship, and
 6       he had shown up to the residence and walked in without
 7       knocking, without ringing the doorbell.  I'm in a bra and
 8       shorts trying to get our son ready, and that's just like not
 9       appropriate.  It's not right.
10              THE COURT:  Okay, all right, anything else you
11       want to say, Ms. Vandomelen?
12              MS. VANDOMELEN:  Not at this time.
13              THE COURT:  All right, well, a petition was filed
14       alleging domestic abuse.  The respondent was served properly
15       and has had an opportunity to be heard.  The Court does have
16       personal and subject matter jurisdiction over this matter.
17       Based on the definition of domestic abuse for these
18       incidents, I can't find that it has risen to the level of
19       domestic abuse, and I think Ms. Vandomelen acknowledges
20       that.  I'm not sure, at this point, if it rises to the level
21       of harassment or not, either.
22              The problem is, what I think would resolve this
23       for you, Ms. Vandomelen, when you're asking me what would
24       help, is if you guys either went to mediation through the
25       family court order and got a set schedule so that it's not
```

Case 1:19-cr-00201-WCG   Filed 09/16/20   Page 19 of 24   Document 39-2

```
 1     the coming and going, or did grandma call, or did you call.
 2     You know, if you had a placement schedule, then you would be
 3     able to show he's showing up when he's not invited, because
 4     part of the harassment thing is it's got to be conduct that
 5     serves no legitimate purpose, and what I have seen in
 6     harassment cases where there are parents involved is that
 7     the child, obviously, is a legitimate purpose.  So if it's
 8     outside of a scheduled time, you can kind of show that it's
 9     above and beyond the normal.  If there's not a schedule,
10     then it's a he said/she said.  Do you know what I'm saying?
11                 MS. VANDOMELEN:  Yeah.
12                 THE COURT:  Clearly the language is atrocious.
13     Clearly the fact that you speak that way in front of a small
14     child is going to impact how that child grows up.  So that's
15     something as parents you guys need to think about.  That's
16     not okay.  Speaking that way to another person is not okay,
17     but it doesn't rise to the level of injunction worthy, not
18     from what I've heard today.  That doesn't mean she's not
19     going to be able to bring another injunction under
20     harassment if there continues to be swearing and yelling and
21     all those things.  There's not a court in the land that's
22     going to find that that's legitimate, a legitimate purpose
23     or a legitimate way to communicate.  So that's something you
24     both need to think about.  I do think some distance is
25     probably a good idea for the two of you, but that's why I
```

1      think a schedule for River would really assist that. I've
2      heard, you know, that Ms. Vandomelen has concerns with
3      regard to your use, or drinking, or whatever. Sometimes you
4      can incorporate into a stipulated placement schedule that if
5      there is suspicion of that, that the placement would be
6      suspended, but that's something the two of you would have to
7      agree to.

8              The same for Mr. Beaudry, if you want to come
9      into court and try to get a placement schedule, you can file
10     a motion or request post-judgment mediation, because you're
11     likely, if you can't reach an agreement in court, going to
12     get sent to mediation anyway to come up with some kind of a
13     schedule, or holiday placement, or whatever, so you guys
14     don't have to have all this friction, you know, when it
15     comes to placement of River, or visiting River, or can he go
16     or can't he go, and what time, because then you have it set.
17     If it's Saturday at noon and Dad's not there at noon, then
18     he forfeits his placement, right? So I think that's
19     something you guys should seriously consider, either
20     stipulating to, and those forms are available, or getting
21     into mediation and coming up with something that you both
22     agree to, or coming back into family court and getting some
23     kind of order to alleviate all this contact that you've sort
24     of told me about today.

25             Do you have questions, Ms. Vandomelen?

```
 1                    MS. VANDOMELEN:  No, I mean --

 2                    THE COURT:  Do you have questions, Mr. Beaudry?

 3          Mr. Beaudry, any questions?

 4                    MR. BEAUDRY:  I guess just the verbiage on the

 5          paperwork.  Yeah, I would like to understand why -- I mean,

 6          there's lots of boxes on here that are checked that don't

 7          apply.

 8                    THE COURT:  It's being dismissed, sir.

 9                    MR. BEAUDRY:  Oh, all right, well, I guess --

10                    THE COURT:  It's being dismissed, sir.

11                    MR. BEAUDRY:  All right.  Well, I guess then I'm

12          not going to ask any questions then.

13                    THE COURT:  There no point in asking questions

14          about the form because it's being dismissed.

15                    MR. BEAUDRY:  Yeah, yeah, right, right, right,

16          right.  Okay, all right.

17                    THE COURT:  All right, so you'll get a copy of

18          the dismissal order in the mail.  Let me just -- are you

19          still on Robin Way, sir?

20                    MR. BEAUDRY:  Yup, 606 East First Avenue.  Wait,

21          Robin Way?  No, no, no, not Robin Way.  It's the same

22          address I gave in the beginning.

23                    THE COURT:  All right, all right.  Okay, that's

24          the one in the family court case.  You might want to update

25          Child Support on your address and make sure the Clerk's
```

1    office has it in that file, as well, if you get any notices.

2          All right, I hope it goes better for the two of

3    you.  I hope you got some suggestions from the Court on how

4    to maybe alleviate some of the issues, but you certainly

5    have the Court's opinion on the language and things that are

6    being used.

7          I wish you both luck, and feel free to file that

8    motion in family court to get a more definite placement if

9    that's what you want to do to alleviate some of this

10   friction, okay?

11              MR. BEAUDRY:  That sounds good.

12              THE COURT:  All right, good luck to the two of

13   you.

14              MR. BEAUDRY:  So we can hang up?

15              THE COURT:  Yeah, we're good, thank you.

16

17

18

19

20

21

22

23

24

25

```
1                        REPORTER'S CERTIFICATE

2       STATE OF WISCONSIN)
                          )ss.
3       OUTAGAMIE COUNTY  )

4

5                I, Rebecca Hietpas, Court Reporter, do hereby

6       certify that I reported the foregoing matter and that the

7       foregoing transcript has been carefully compared by me with

8       my stenographic notes as taken by me in machine shorthand,

9       and by computer assisted transcription thereafter

10      transcribed, and that it is a true and correct transcript of

11      the proceedings had in said matter to the best of my

12      knowledge and ability.

13

14                        Dated this 8th day of September, 2020

15

16                        Electronically signed by Rebecca Hietpas
                          Court Reporter
17

18

19

20

21

22

23

24

25
```