```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF WISCONSIN
                       GREEN BAY DIVISION
-----------------------------------------------------------
 UNITED STATES OF AMERICA,         )
                                   )
                    Plaintiff,     )  Case No. CR 19-201
                                   )  Green Bay, Wisconsin
      vs.                          )
                                   )  September 18, 2020
 MASON O. BEAUDRY,                 )  1:29 p.m.
                                   )
                    Defendant.     )

-----------------------------------------------------------
```

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES VIA ZOOM:

  For the Government:        United States Dept of Justice
                            (ED-WI)
                            By: DANIEL R. HUMBLE
                            Office of the US Attorney - 205
                            Doty St - Ste 301
                            Green Bay, WI 54301
                            Ph: 920-884-1066
                            Fax: 920-884-2997
                            Daniel.Humble@usdoj.gov
  For the Defendant
  MASON O. BEAUDRY:          Federal Defender Services of
  (Present)                  Wisconsin Inc
                            By: Krista A. Halla-Valdes
                            801 E Walnut St - 2nd Floor
                            Green Bay, WI 54301
                            Ph: 920-430-9900
                            Fax: 920-430-9901
                            krista_halla-valdes@fd.org

  U.S. Probation Office:     BRIAN KOEHLER (920) 884-7785


  U.S. Official Transcriber: JOHN T. SCHINDHELM, RMR, CRR,
  Transcript Orders:         WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording via Zoom,
transcript produced by computer aided transcription.



1

1                    TRANSCRIPT OF PROCEEDINGS

2                 Transcribed From Audio Recording

3                          *    *    *

4           THE CLERK:  Court calls Case No. 19-CR-201, United

5    States of America vs. Mason O. Beaudry for a sentencing.  May I

6    have the appearances, please?

7           MR. HUMBLE:  Dan Humble for the government.  Good

8    afternoon, Your Honor.

9           THE COURT:  Good afternoon.

10          MS. HALLA-VALDES:  Good afternoon, Your Honor.  Krista

11   Halla-Valdes on behalf of Mason Beaudry.  Mr. Beaudry is present

12   and appearing via Zoom at this hearing.

13          MR. KOEHLER:  Good afternoon, Your Honor.  Brian

14   Koehler on behalf of Probation.

15          THE COURT:  Okay.  Where is Mr. Beaudry?  He's at his

16   home or where?

17          THE DEFENDANT:  Yes.

18          MS. HALLA-VALDES:  He is at his home.

19          THE COURT:  Okay.  And this, of course, is a Zoom

20   hearing which requires the defendant's consent, first of all.

21   After discussion with his attorney, and I think you filed a

22   motion indicating you had held such a discussion,

23   Ms. Halla-Valdes?

24          MS. HALLA-VALDES:  Yes, Your Honor, I did.

25          Just to add, this morning Mr. Beaudry emailed me and

1    his friend that he had direct contact with earlier this week

2    tested positive for COVID as well.  So he is in a

3    self-quarantine mode as of today.  I just wanted to add that as

4    another reason, but I had filed the motion as well.

5            THE COURT:  Okay.  Mr. Beaudry, that's correct, you

6    talked to your attorney and consent to appearing by video

7    instead of a live hearing in court; is that right?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  Okay.  And I'll also find that further

10   delay would seriously interfere or harm the interests of

11   justice.

12           And that's really because we need to move on.  We

13   don't know how long the pandemic will last.  The chief judge has

14   found that live appearances, live courtroom appearances

15   seriously endanger public health.  So rather than just postpone

16   this indefinitely, it seems to me we need to move forward.

17           So that said, Mr. Beaudry is before the Court today

18   for sentencing for the crime of felon in possession of a

19   firearm.  This is a violation of 18 U.S.C. § 922.  The maximum

20   penalty is 10 years in prison, the maximum fine is $250,000.

21           I have, of course, the presentence report prepared by

22   Mr. Koehler.  I also have a sentencing memorandum from the

23   defense, as well as a supplement to the sentencing memorandum.

24           We postponed this sentencing when we were here last at

25   the government's request because it had received information

1    about a possible new offense, or at least information relevant

2    to the sentencing determination when we were last here, and my

3    understanding from the supplementation, Mr. Humble, is that that

4    evidence really kind of fell apart, there's not much there.  Is

5    that a fair statement?

6              MR. HUMBLE:  Yes.

7              THE COURT:  There was a hearing involving his

8    significant other that was found not to reveal any evidence of

9    either possession of firearms or domestic violence.

10             MR. HUMBLE:  Yes.  It was filed that morning of the

11   last sentencing hearing, so obviously I felt an obligation to

12   check it out, but it appears that it turned into nothing

13   relevant for today's proceedings.

14             THE COURT:  Okay.  So, Mr. Humble, are you in

15   agreement with the factual statements set forth in the

16   presentence report then?

17             MR. HUMBLE:  Yes.

18             THE COURT:  And the guideline calculation, are you in

19   agreement with that?

20             MR. HUMBLE:  Yes.

21             THE COURT:  And, Ms. Halla-Valdes, you've gone over

22   the presentence report with your client?

23             MS. HALLA-VALDES:  I have, Your Honor.

24             THE COURT:  Any objections to the factual statements

25   in the report?

1          MS. HALLA-VALDES:  No, Your Honor.

2          THE COURT:  And are you in agreement with the

3    guideline calculation that's recommended?

4          MS. HALLA-VALDES:  I am, Your Honor.

5          THE COURT:  So I will adopt then the factual

6    statements in the presentence report as my findings of fact.

7          I will also adopt the recommended guideline analysis

8    which places the offense level at a 17, criminal history

9    category is III, resulting guideline range is between 30 months

10   and 37 months.  So that'll be the starting point in the

11   sentencing determination.

12         Mr. Humble, what is the government's recommendation?

13         MR. HUMBLE:  Your Honor, the government's going to

14   recommend a sentence of 30 months.

15         With regard to the nature and circumstances of the

16   offense, the Court's well aware this is a serious offense.

17   Essentially what happened to --

18         THE COURT:  30 months?  What did you say?

19         MR. HUMBLE:  30 months.

20         THE COURT:  30 months.  Go ahead.

21         MR. HUMBLE:  As the Court's aware, this is a serious

22   offense.  It's a classic straw-buying situation between the

23   defendant and Mr. Cardenas.  The defendant had Mr. Cardenas

24   purchase that firearm and 100 rounds of ammunition at the time

25   those individuals were engaging in the trade of marijuana, the

1   sale of marijuana from the residence.  The Court's well aware of

2   the inherent danger to mixing drugs and guns.

3           The defendant's history is two prior felony drug

4   convictions within the past five years.  On supervision he has

5   not been successful.

6           As the Court's aware based on Mr. Koehler's filings,

7   the defendant had a recent incident while on pretrial release on

8   September 7th where the officer stopped him in the car at two

9   different times.  Probation asked him to come in and provide a

10  drug test and he failed to do so.

11          The need for deterrence here I think is strong with

12  regard to specifically this defendant, but also the public at

13  large.  Obviously for a long time my office and the courts have

14  been taking seriously these types of straw purchases and

15  prosecuting felons in possession of firearms, and there's a need

16  to send that message to the public that we take this seriously.

17          And I think a sentence of 30 months, which is at the

18  lowest end of the guideline, takes into account the fact that he

19  did promptly enter a guilty plea here.  But I do think, given

20  the serious nature of the offense and his past record, 30 months

21  is an appropriate prison sentence, Your Honor.

22          THE COURT:  All right.  Thank you, Mr. Humble.

23          Ms. Halla-Valdes?

24          MS. HALLA-VALDES:  Your Honor, I filed a sentencing

25  memorandum and I am asking for probation.  I provided a number

1   of reasons why I think probation is appropriate in this case.

2   And then I filed a supplement because I wanted it to be clear

3   that Mr. Beaudry was not alleged to have any other contact with

4   weapons recently and that there was not incidents of domestic

5   violence.

6          I still believe that a sentence of probation is

7   appropriate.  I believe that for a number of reasons.  The first

8   is mostly because this is an offense where Mr. Beaudry had

9   limited contact with the gun.  At the time he was living with

10  Juan Cardenas, he was using marijuana, I don't know that there

11  was any proof of sale of marijuana.  He was absolutely using and

12  he admitted to that.  He couldn't buy the gun.  He did speak

13  with his roommate/friend Mr. Cardenas.  He gave the money to

14  Mr. Cardenas to purchase the gun, but both of them actually used

15  it.  Both of them went to the shooting range and used it.

16         Mr. Cardenas, in fact, was the person who was going to

17  hold onto it.  If you look at the police reports, the fact is

18  that the gun was kept at a coworker's of Mr. Cardenas.

19  Mr. Beaudry did not even know who the coworker was or where it

20  was located.  It was Mr. Cardenas who provided that information

21  to the police.

22         So I think while it is true that Mason spoke with

23  Mr. Cardenas, Mr. Beaudry spoke with Mr. Cardenas about

24  purchasing the gun, I think the fact is that both of them had

25  the intent of using it and both of them did use it when they

1    went to the shooting range to use it.

2         That gun wasn't used in any additional criminal

3    activity.  It was located at the coworker's home where

4    Mr. Cardenas said it would be.

5         Mr. Beaudry, when he was approached by police and

6    arrested in August, admitted to the fact that he had shot the

7    gun at the range.  I think, in fact, what he told the police was

8    if you want to watch, you can get the video and watch.  I used

9    it at the range.  I handled it, you know, in the manner it was

10   supposed to be.  And that was the only place that it was ever

11   shot.

12        And that's the extent of what the offense involves

13   here.  He is a felon, he knows he is a felon, and he knows he

14   can't possess guns.  What I don't think Mr. Beaudry was aware of

15   is just how serious this was.  I think that became very clear

16   when he was arrested not only by the state, but more so when he

17   was called in to federal court.

18        He was arrested in August of last year by the State.

19   He paid a bond and was released.  He followed through on the

20   conditions of release, and then he was indicted here.

21        He showed up for arraignment November 19th.  It was a

22   notice to appear and he showed up in person.  He was released on

23   conditions and he's been out just about a year straight.  Or,

24   no, just about 10 months on those pretrial release conditions.

25        I believe that he has been compliant.  I understand

1    the government says that he was asked to come in and do a drug

2    test and he hadn't done that.  That was after September 7th.  I

3    am not -- honestly, Your Honor, I'm not aware of the entirety of

4    that situation.

5         But Mr. Beaudry has been working and has -- for the

6    most part he lives at home now with his mother and he's been

7    there providing care for his son.  He sees his son on a daily

8    basis.  His son is River.

9         And I think when one reads the presentence

10   investigation report, one notices that Mr. Beaudry, through the

11   statements made by his mother but also through the letters of

12   family, has been very much been involved in his son River's

13   life.  He sees him on a daily basis.  He's there right now, in

14   fact, his son.  His son is taking a nap.

15        And although he has had struggles with River's mother

16   in the past, the fact is that he hasn't had those more recently.

17   She has been -- they have been in a good place in terms of

18   allowing Mr. Beaudry to have that daily contact with him.

19        And I think one of the things that speaks to that

20   probably more than anything else is the fact that River's

21   grandmother on the mother's side submitted a letter, and in that

22   letter she speaks to the fact that Mason is a good father and

23   how River is very much connected to his father and how this

24   would have a detrimental impact on River were he not to have and

25   that connection not to stay.

1    And when I think that someone -- you know, this isn't

2    his own mother, this is the mother of the -- his significant

3    other -- or ex significant other because they are no longer

4    together -- and she says that, I really do think that it's

5    something that is confirmation that, in fact, it's true.

6    And I say that because I think when all of the letters

7    are looked at together, it is clear that Mr. Beaudry has been

8    very active in River's life.  For Mr. Beaudry I think that has a

9    lot to do with the fact that he felt abandoned by his own

10   father.  His mother speaks to that in the PSR.

11   And the fact is that he also speaks to that in terms

12   of his acceptance of responsibility statement.  Now that he is

13   in his son's life and he is there on a daily basis, sees him

14   seven days a week, the last thing he wants to do is abandon his

15   son or his son to feel that he is been abandoned by Mason.

16   For those reasons I think Mason has done what he can

17   to stay very active in his father's -- in his son's life.

18   I also think one of the big reasons is because he now

19   has this career.  Yes, he had worked previously, but now he's at

20   the point where he is working his way up the ladder to becoming

21   an apprentice to a welder.  He's working through Tweet Garot.

22   He's been working there for a while now, since May actually, and

23   he is really one step away from becoming an apprentice.

24   And that's important to Mason.  Mason has worked there

25   since May.  He previously had worked at other locations doing

1  similar work, but this is where he believes that he can stay.

2  He was placed there by the local union and he believes that this

3  is a career for him.  Welding, of course, is a good-paying

4  career, it's a career that Mason knows he can live financially,

5  be independent and be financially stable.  And that's important

6  to him because he wants to provide for not only himself but,

7  more importantly, for his son.

8       The other thing that he wants to do is go back to

9  court and establish joint custody with his son's mother.  He has

10 not done that.  The biggest reason is because he was waiting for

11 this to be resolved so that he would know what was going to

12 happen to him before he set up any sort of visitation or any

13 sort of him spending the nights with Mason.  So I believe based

14 on those reasons the fact is that probation is a good

15 sentence -- or is sufficient but not greater than necessary.

16      The last thing I do want to talk about is the fact

17 that -- well, there's two things and then I'll get to that.

18 Mason was previously on supervision by the State in 2016.  He

19 was discharged from that.  He received probation.  And he was

20 discharged from that and he had no issues with compliance.

21      He also -- his previous times in jail he was allowed

22 to do Huber, so he was allowed to still work.  And I think

23 that's evident by the fact that he also is up to date I think

24 with a small -- and I don't know if the arrearage has been paid

25 off more recently -- but for the most part he's up to date on

11

1  his child support.  He's shaking his head yes, so I think the

2  whole arrearage has since been paid off.  But all of that is

3  because he's been allowed to continue through on the career that

4  he's doing right now.

5          The last thing I want to talk about, Judge, is the

6  fact that in this situation I think when the Court has to

7  consider a sentence that is sufficient but not greater than

8  necessary to accomplish the goals of sentencing, I think the

9  Court has to acknowledge the fact that sentencing is different

10  now because of COVID.  Especially right now.  Incarcerating a

11  client right now means that they are at a higher risk of getting

12  COVID.  But also, when one looks at the type of time that

13  they're going to do in custody, it's much more oppressive.

14          And what I mean by that is, for the most part my

15  clients have very much indicated that they do not have access to

16  communication.  It is very hard for me to have communication

17  with them.  It is very hard for them to have communication out.

18          The people that I have the most communication with are

19  those who have CorrLinks, and that is not established usually in

20  the beginning when they get into a prison.

21          Also, there is no programming going on right now.

22  There has not been programming going on for the past since

23  March.  So that means that everyone sits, does idle time.

24  They're not working, with the exception of some of the people go

25  and still work in the kitchen.  But other than that, for the

september

1    most part my clients have indicated that they are not allowed to

2    leave their dorm area.

3         This is a dorm area where there is not social

4    distancing.  This is a dorm area where they are not given any

5    sort of personal PPEs, where they do not have face masks.  This

6    is an area where they, in fact, are staying, and the fact is

7    there's a heightened risk for COVID.

8         And unfortunately we still don't know what COVID does

9    to people.  Everyone reacts differently.  Even if Mason does not

10   have one of the acknowledged comorbitities, the fact is that

11   there are people out there that don't have it and still end up

12   on ventilators and still end up in very serious conditions.

13        So I think when one looks at sentencing right now,

14   that is something that has to be considered.  And I think when

15   one looks at the fact that the Bureau of Prisons still has only

16   tested approximately one-third of the individuals in their

17   custody, testing one-third means there's two-thirds that aren't

18   tested.  It's shocking that while the DOC demanded everyone be

19   tested, and while universities are having everyone tested, the

20   BOP still believes that testing one-third is sufficient.  It's

21   also shocking that they don't require tests of their staff.  So

22   that means that there are people out there that clearly aren't

23   tested and possibly spreading the virus.

24        And that's what makes the BOP and the situation within

25   the prison so dangerous because the numbers reflect it.  The

1    fact is that even with only testing one-third, there's been over

2    13,500 positive cases.  It's close to 30 percent.  That's a high

3    number.  And they haven't tested the other staff and they

4    haven't tested the other inmates.

5              So, Your Honor, I think that all goes into how a

6    sentence would be served at this time and I think that that

7    needs to be considered.

8              I also think one of the goals of sentencing is

9    vocational and educational training.  The fact is that

10   Mr. Beaudry, Mason, has a job.  He really does not need

11   vocational and educational training, but if going to jail it

12   would really mean him sitting dead time and doing nothing.

13             That is certainly not something that is worth -- I

14   think in terms of he would be a lot more -- it would be a bigger

15   benefit to society and the community having him out there

16   working, paying his child support, and providing care to his son

17   than sitting and doing dead time in a dorm where he could

18   possibly run the risk of getting COVID.

19             For those reasons, Your Honor, I do think probation is

20   appropriate.  I think the fact is that it is sufficient but not

21   greater than necessary to meet the goals of sentencing.  I would

22   ask for probation.  If he messes up, if he screws up, the judge,

23   you always have, the Court always has the option of putting him

24   in at a later time.  And I think that that puts it in his hands.

25             If some further form of punishment is needed, I would

1    ask for home confinement rather than any time in custody.

2    Again, that alleviates the concerns regarding COVID.  It also

3    allows him to continues working and it allows him to be in his

4    son River's life.

5              That is all I have, Your Honor.

6              THE COURT:  Thank you.

7              Mr. Beaudry, anything you want to say before I impose

8    a sentence?  Can't hear you, you gotta unmute.

9              THE DEFENDANT:  Sorry.  Am I good?

10             THE COURT:  Yes.

11             THE DEFENDANT:  Okay.  I would just like to say that

12   my biggest goal here is to be that father figure that I didn't

13   have growing up.  I do -- I pride myself on being a dad and I

14   pride myself on the work that I do to provide for my son.  I

15   just refuse to be the dad that I didn't have.  He left when I

16   was I wanna say seven years old, and so I haven't had him in my

17   life for decades now.  And he tries to -- he tries to insert

18   himself back into my life to this day, and I just don't feel

19   that it's appropriate for him to have that permission I guess on

20   my behalf because he chose to leave me, you know, when I was

21   seven years old.  So I feel why should I give him the benefit of

22   speaking with me.  Not only that, but he's had five other

23   children.  So I have five step-siblings as well that all got

24   taken by CPS.  Every last one of them got taken by child

25   services.  Why, I don't know.  But, you know, I don't want to be

1    that -- I don't want to be him.  I refuse to be that man.

2          I work, I take care of my son daily, I do everything I

3    can to make sure he's okay, to make sure the mother of my son is

4    okay, you know.  I do everything that I possibly can to make

5    sure that he's okay.

6          You know, I understand what I did is wrong.  I take

7    full responsibility for my actions.  I'm not going to lessen --

8    I'm not going to lessen the extent of the crime committed.  But

9    I will say in my defense, I guess I didn't understand the real

10   precautions of something like this happening.  So I didn't have

11   full understanding of what I was -- I knew what I was doing, I

12   just didn't understand the full extent of the trouble that I

13   could be in.

14         And I take full responsibility for my actions.  I

15   can't blame that on nobody but myself.  You know, it was me that

16   did it.  I can't -- I have to take responsibility as a man for

17   my son, for myself, for my family.  I have to take

18   responsibility.

19         And I -- you know, the last probation that I was on I

20   successfully completed.  I paid my probation dues and I got off

21   successfully.  In fact, my last probation officer's name was

22   Krista Grubley (sp), her and I got along great.  And that's who

23   successfully discharged me from the probation for the state

24   anyways.  That was on the state level.

25         And with that being said, I just want to continue my

1    career.  And I feel that incarceration would be very detrimental

2    for my job.  Like Krista said, I do want to become a welder and

3    I'm taking the proper steps in order to do so.  You know, I go

4    to work, they send me in the field so I can get some field

5    experience.  You know, they send me to different locations, to

6    different shutdowns and stuff of that nature.

7            In fact, I was in Manitowoc the other week building

8    COVID pods, in fact.  So pods that individuals with COVID are

9    designed to stay in and sleep so if you are -- if you are

10   diagnosed with COVID, they put you in these pods actually and

11   you are to live there until your quarantine is up.  And I was in

12   Manitowoc working on a job like that.

13           I was in Oconto Falls working on a boiler room.  You

14   know, I'm learning a lot in my job.  And from high school this

15   is what I have I've wanted to do.  And I feel with the company

16   that I currently work at, this is my opportunity to do so and

17   this is my opportunity to provide for my son.

18           I did make a mistake.  It's been a year since that

19   mistake has been made.  And I've taken corrective action.  I

20   don't associate with the individuals that I used to associate

21   with.

22           My main focus is my son.  From sun up to sun down, my

23   son is my main focus.  And I would just -- that's -- that's -- I

24   would just like to leave it there.  That's all I have to say for

25   you, Your Honor.  Thank you.

17

1          THE COURT:  All right, thank you.

2          When was your son born, Mr. Beaudry?

3          THE DEFENDANT:  He was born in September 10th, 2018.

4     He just turned two last week Thursday.

5          THE COURT:  What were you doing out on September 7th?

6          THE DEFENDANT:  I was on my way home from a friend's

7     house and I actually had an incident where the week prior to

8     that, I wanna say it was one week prior, I fainted.  I don't

9     know the cause.  I actually have to go see a medical doctor for

10    it because the orthopedic specialist said they couldn't handle

11    it there.  I had fainted and I scuffed up my eye.  It's healed

12    now.  You can't really see it now.  But I fainted walking out a

13    Subway and I landed on my face and shoulder.  I don't know what

14    the cause of it was.  I felt completely normal walking into the

15    Subway.

16         And that particular situation that night I felt that

17    happening.  So I pulled over and I believe that's what happened,

18    I had fainted and I -- you know, and I think I have to go see a

19    medical doctor.  I'm not sure what's wrong with me.  And that

20    caused me to actually miss work for a week because I sprained my

21    shoulder when I had fallen.

22         THE COURT:  Then an hour or two later you're again

23    found in your car passed out?

24         THE DEFENDANT:  Yes.  I should have just walked home

25    is what I should have done.  I didn't want -- and this case has

1  been eating me alive.  I just -- my sleep schedule has been so

2  messed up, I --

3          THE COURT:  Why didn't you report -- why didn't you

4  report to probation for a drug test after you were told to on

5  the --

6          THE DEFENDANT:  That Friday, so I had an orthopedic

7  specialist meeting.  And then my sister had my vehicle because

8  she wanted to make it to my son's birthday party.  So she had my

9  vehicle.

10         That being said, I called him, I left him a voicemail

11  indicating the situation that I couldn't make it, you know,

12  Friday, and I told him to give me a call back and to be in touch

13  with me and I had never received a -- you know, I had never

14  received a phone call back from him.

15         THE COURT:  Mr. Koehler, did you receive a call that

16  you didn't return?

17         MR. KOEHLER:  I did receive a voicemail from

18  Mr. Beaudry after I had already left the office for the day.

19         THE COURT:  Did you try to get back to him?

20         MR. KOEHLER:  I did not, Your Honor.

21         THE COURT:  Okay.  Anything else you wanna say?

22         THE DEFENDANT:  Just --

23         THE COURT:  I've heard quite a bit so --

24         THE DEFENDANT:  Yeah, basically I should probably go

25  get checked by an actual doctor.  Currently I have to -- I don't

1  know if this was stated, but I have to self quarantine myself

2  right now because I was in direct contact with the COVID virus

3  from one of my friends.  So now I found that out, I actually

4  have to contact my employer and let them know and I have to get

5  retested again.

6          THE COURT:  Okay.  Now, I'm looking at your record,

7  Mr. Beaudry, and on August -- well, August 25th, '15 you were

8  arrested at age 19.  On April 22nd, 2016 you were sentenced for

9  two counts of -- or manufacture, delivery of THC and possession

10  of narcotic drugs.  You received four years probation, 100 days

11  jail.  Your probation was revoked less than a year later.  And

12  you were given 12 months jail, each count consecutive.

13          THE DEFENDANT:  Yes.

14          THE COURT:  So that's two years from 3/19/17.  When

15  did you get -- when did you complete your jail sentence there?

16          THE DEFENDANT:  I wanna say the exact day was

17  September 3rd, 2018, because I believe it was one week previous

18  to my son being born.  It was -- actually was one week I think

19  prior to my son's birth.  I think that's the exact date of my

20  release.  And then I had to finish -- and then I still had

21  probation left to finish which I hadn't completed.

22          THE COURT:  And your probation was completed when?

23          THE DEFENDANT:  When was it completed?  I wanna say --

24          THE COURT:  After completion of your -- I mean, if

25  your probation was revoked --

1          THE DEFENDANT:  April 29 -- what's that?

2          THE COURT:  April 29th of 2019?

3          THE DEFENDANT:  Oh, when my probation was revoked?

4          THE COURT:  I guess your probation was revoked on

5    March --

6          THE DEFENDANT:  No, no, my probation was revoked

7    from -- March of when?

8          THE COURT:  I see.  No, your probation was revoked on

9    your felony offense on March 9th of 2017, but you also had the

10   --

11         THE DEFENDANT:  Yes.

12         THE COURT:  -- possession of THC second offense in

13   2016.  You did two years of probation on that, 90 days jail.

14   You were discharged from that on March 23rd, 2019.

15         So, what, six months later --

16         THE DEFENDANT:  Yes.

17         THE COURT:  -- less than six months later you're

18   buying a gun at Fleet Farm through your friend.  And according

19   to your friend you're also selling pot out of the house?

20         THE DEFENDANT:  No, that --

21         THE COURT:  When your son was a year old?

22         THE DEFENDANT:  Currently -- well, currently he's two

23   now, yes, sir.  Yes, sir, he's two now.

24         THE COURT:  I guess -- okay.  You know, in arriving at

25   a sentence I look at the guideline range, and here it's 30 to 37

1    months.  That's the starting point.  But then I look at the

2    nature and circumstances of the offense and the history and

3    character of the defendant and then I try to fashion a sentence

4    that meets the goals of imposing just punishment, that's

5    punishment that reflects the seriousness of the offense, it

6    promotes respect for the law.

7                I look at the need for deterrence.  You know, part of

8    what courts do, part of what the law does it sends a message.

9    The message is not only to be sent to Mr. Beaudry but to others

10    that, look, when you're told you may not own a gun because you

11    forfeited your right to own a gun or possess a gun because of

12    your prior conviction, that's a serious matter.  You don't

13    ignore that and go out and buy a gun or have a friend buy a gun.

14                And I think given the damage and the carnage that's

15    done with guns these days, most people are crying out for

16    significant penalties for people that violate our -- the gun

17    laws we have.  In fact, people want more laws beyond what we

18    have now.  So at the very least they're asking is that we

19    enforce the ones that do exist.

20                Another purpose of sentencing is protection of the

21    public from further crimes of the defendant.  And then lastly,

22    of course, is rehabilitation.

23                Looking first at the nature and circumstances of the

24    offense, you didn't go out and buy a hunting gun, hunting rifle,

25    you bought a handgun, a .9 millimeter handgun.  You knew you

1    weren't supposed to own it.  When you were shooting it in the

2    firing range you wore gloves to keep your fingerprints off it.

3    You had a friend buy it with your money.  Your friend got

4    nothing out of it other than you involved him in a serious crime

5    and now he's got a conviction as well.

6         And this was such a short time after your release --

7    after your probation is discharged.  You know, I understand

8    somebody that asks for probation when they're a first offense.

9    But you're not only not a first offense, but you had a chance

10   for probation.  You got relatively, you know, 100 days jail with

11   work release, I'm sure.  And you didn't even complete that, you

12   got revoked.  And then you get 12 months consecutive on each

13   count again with work release, and it seems to have had no

14   effect because you went right back to this conduct.

15        And I don't -- you know, the idea I didn't appreciate

16   the seriousness of it, maybe you didn't know what would happen,

17   but you certainly knew it was illegal, you knew it was wrong.

18   Anybody that looks around today knows that dealing with firearms

19   is a serious matter.

20        And the fact that you had a friend buy it, wore gloves

21   when you shot it, kept it at someone else's home tells me you

22   were aware of the risk you were taking.

23        So I find the offense serious, I find your culpability

24   great.  I don't -- you know, I certainly recognize, Mr. Beaudry,

25   really your passion.  And I think it's good.  Using your son as

1    a goal, as a focus, as a motivation for you, I mean, he's more

2    than that, he's a human being.  He deserves more than being just

3    someone's motivation.  He deserves what you want to give him.

4    But what you really haven't given him because you were released

5    before his birth and you went back to this behavior so soon

6    afterward.

7          But I don't -- I mean, recognizing that, that's past,

8    you can't undo it, but when you say I take full responsibility,

9    I think part of that is also I accept the punishment that I

10   deserve.

11         Now, I'm taking into consideration COVID that your

12   attorney mentioned.  I also am taking into consideration what I

13   think is your sincere desire -- I hope it's sincere.  I don't

14   know of course, but you sound sincere.  And to me you have every

15   reason to be sincere in wanting to be a better man, to be a

16   father to your son.

17         It's a privilege to have a son.  You were lucky to

18   have a son.  And you ought to be doing everything you can to

19   make up to your son the fact that you can't be there every day;

20   that you don't have a closer relationship to his mother; that

21   you are now -- you know, put yourself in a position where you're

22   going to be away from him.

23         But I'm not going to -- I understand the government's

24   recommendation for 30 months, it's not unreasonable, but I'm

25   going to go significantly below that.  I'm going to impose a

1    sentence of a year and a day.  And with good time it's probably

2    closer, your attorney can tell you, I assume it's closer to 11,

3    10 months, something like that.  And they might let you out --

4    they might even let you out earlier on some sort of halfway

5    house.  I don't know, that's Bureau of Prisons.

6           But when I look at this record I have to impose a

7    sentence, it seems to me, that gives some punishment for this.

8    And I recognize that this is -- you know, you were hoping --

9    one, I don't think you should say, well, I can't -- I've lost my

10   vocation.  If you have those skills you can get employed again.

11   There's so many people out there looking for people that will do

12   the work, with good attitudes.  And if you have a good attitude

13   and commit to showing up on time, which is a great deal of

14   success in this world, showing up and showing up sober and

15   showing up on time, and show good work habits, then you should

16   be able to accomplish -- you know, do your time, then get out

17   and don't put yourself in this position again.

18          I am certainly aware that some of the prisons COVID

19   passes, but you are a young man, you are healthy.  Yes, we don't

20   know everything about this disease, but we do know for the vast

21   majority of healthy young men it's really -- it's not that

22   serious.  At worse it's a bad case of the flu.

23          That's not to say it's everybody that way, but for

24   younger people without comorbitities, that is the information

25   that we have.  The death rates and the hospitalization are

25

1    almost all -- they're for much older and much more seriously ill

2    people.  You're a healthy person, so I'm satisfied:  One, the

3    prison will do everything it can to protect you; but, two, even

4    if you get this lousy illness, it's not fatal, it's not going to

5    could you in.  You're a healthy person and you ought to go into

6    things with that attitude.  You shouldn't be, you know, over

7    concerned about that.

8          But I am satisfied, though, given this record, given

9    the fact that you've had probation, you've had opportunities and

10   you went back and committed another serious crime, that some

11   penalty is appropriate.  And so that's the sentence I've

12   imposed.

13         I don't view you as frankly -- I mean, the idea that

14   you were buying a gun, I don't think you were just buying it for

15   target practice.  That doesn't make sense to me.  And I'm not

16   saying you were planning on shooting somebody, but it seems to

17   me you saw a need for your protection or you thought you were in

18   a position where you may need to use this.  And you're

19   prohibited from having a gun because of your record.  And there

20   was no reason you went out to buy a gun, especially with the

21   other obligations you had financially for your son.

22         So I think that it makes sense to impose some penalty

23   and I think I've chosen the least significant penalty based on

24   this record and the nature and circumstances of the offense.

25         I'll also impose three years of supervised release.

1          I've imposed a much lower than the guideline sentence,

2   a much lower sentence than the government, as I said, did not

3   unreasonably ask for, but -- and so I'm going to impose three

4   years of supervised release so that if you show me by your

5   conduct that you're not sincere or that sincerity does not

6   continue, then you'll be back before the Court and you'll be

7   revoked and sent back to prison.  I hope that doesn't happen,

8   because I think you really -- there's no reason for you to end

9   up back where you are.  If you have a good attitude like it

10  seems -- and keep that.  Don't get bitter.  You've got a much

11  lesser sentence than I would hope you had a reason to expect.

12  In part because of the COVID, and I recognize the punitive

13  nature part because I'm sure you're worried about things, but I

14  expect you to be out in less than a year and I expect you to go

15  back to building -- rebuilding your life and making it into

16  something positive.

17          But when I look at the need for deterrence, the need

18  for punishment, the need for protection of the public.  And I

19  hope you take in this sincerely.  I hope you spend that time.

20  If there's not programming, you start thinking about where you

21  wants to be in life and how you're going to avoid putting

22  yourself in this position again.  And that should be -- your

23  time will pass.

24          But the conditions of supervision are set forth, or at

25  least the recommended ones, at the end of the presentence.

1    Ms. Halla-Valdes, have you gone over those with your

2  client and do you want me to read them as part of the

3  pronouncement of sentence?

4    MS. HALLA-VALDES:  No, Your Honor, we did review them

5  and we would waive formal reading at this time.

6    THE COURT:  All right.  Normally, Mr. Beaudry, as part

7  of the pronouncement of sentence I would read each of the

8  conditions.  Your attorney said you've gone over them, you don't

9  have objection, and you waive reading.  Is that right?

10    THE DEFENDANT:  Yes, Your Honor.

11    THE COURT:  Okay.  And I adopt those conditions then.

12  I adopt the rationale for those conditions.  Those are the

13  conditions that I impose and they'll be attached to the judgment

14  and you'll receive a copy at the time of your discharge.

15    I'll also impose the $100 special assessment.  If

16  there are any other counts in the indictment, those are ordered

17  dismissed.

18    I'll recommend that if he's placed in custody it be as

19  close to his home as possible so he can have family support.

20    I'll also have no objection to part of the sentencing

21  being served at a halfway house under Bureau of Prison

22  regulations, however they deem it appropriate.

23    Mr. Beaudry, you have the right to appeal your

24  conviction or your sentence.  Your attorney will talk to you

25  about possible grounds to appeal.  If you cannot afford the cost

28

1    of an appeal the clerk will assist you so you can file in forma

2    pauperis and not have to pay those costs.

3            If you choose to appeal you have to file a notice of

4    appeal, and that has to be filed within 14 days after the entry

5    of judgment.  If you fail to file a timely notice of appeal, you

6    would lose that right.

7            Lastly, I'm going to allow voluntary surrender.  I'm a

8    little concerned.  You're to follow the rules of Pretrial

9    Services and that means report for drug testing.  Report to your

10   agent.  If you miss, you might -- a warrant would probably be

11   issued for your arrest and then you're in custody at the jail

12   and it will hurt your security classification.  It will not work

13   well.  So you really want to follow those conditions.  But you

14   continue to follow those conditions.

15           I'm going to give a reporting date of about 45 days

16   away from today.  I am told that if a reporting date is given,

17   that the Bureau of Prisons will honor that.

18           I'll order report on or before Wednesday, November

19   11th.  Or make it Tuesday, November 10th.  That's after your

20   period of quarantine.  And if you need to see -- if you want to

21   go see a doctor, fine.  If there's anything that comes up that

22   the Bureau of Prisons or the Court should know, keep in touch

23   with your attorney.  Follow your conditions of release through

24   that time.

25           Is there anything further?

1          THE DEFENDANT:  Is this time, is it going to be set in

2    a county jail near me or do I have to sit in the penitentiary

3    near me?

4          THE COURT:  You'll be told where to report.  It will

5    likely be in a federal prison.

6          THE DEFENDANT:  Okay.

7          THE COURT:  If you're fortunate it will be at Oxford,

8    not that far away.

9          THE DEFENDANT:  Okay.

10          THE COURT:  But Mr. Koehler will work with you and

11    convey that to you.  You can talk more with your attorney or

12    Mr. Koehler afterwards and they can answer those types of

13    questions.

14          I've recommended Oxford.  I recommend a facility as

15    close to your home as possible.  But this is not a Huber

16    sentence.  We don't -- that's not the typical sentence in

17    federal court.  That's another reason why it's significantly

18    less, but it's a more onerous sentence than the Huber sentences

19    you've received in the past.

20          THE DEFENDANT:  Is there any ways of doing like a GPS

21    sentence?

22          THE COURT:  You can talk with your attorney

23    afterwards.  Anything further?

24          MS. HALLA-VALDES:  No, Your Honor.

25          THE COURT:  Thank you all.  This matter then is

1    concluded.

2                THE DEFENDANT:   Thank you.

3                (Proceedings concluded at 4:45 p.m.)

4                              *    *    *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified December 7, 2020.

/s/John T. Schindhelm

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR
United States Official Reporter
517 E Wisconsin Ave., Rm 236,
Milwaukee, WI 53202
Website: WWW.JOHNSCHINDHELM.COM

